# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ———————————————————— ) | |
| DAWN A. BLACK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 02-2473 (ESH) |
| ) | |
| KENNETH Y. TOMLINSON, ) | |
| Chairman, Broadcasting Board of ) | |
| Governors, ) | |
| ) | |
| Defendant. ) | |
| ———————————————————— ) | |

## <u>MEMORANDUM OPINION</u>

On December 16, 2002, plaintiff Dawn A. Black filed suit under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., alleging that her former employer, the United

States Information Agency ("USIA"),[1] engaged in retaliatory nonselection and other adverse

actions following her pursuit of gender discrimination claims against the agency.  Before the

Court is defendant's Motion for Summary Judgment.  For the reasons explained herein, the Court

will grant the motion.

## BACKGROUND

Plaintiff began her work as a graphic artist in the USIA Office of Cuba Broadcasting's TV

Marti unit in 1991 and was promoted to the position of Art Director (TV Production Specialist),

GS-13, in 1995.  (Pl.'s Ex. 5 (Black Affidavit); Def.'s Statement of Mat. Facts as to Which There

is No Genuine Issue ¶¶ 1-2 ("Def.'s Stmt."); Compl. ¶¶ 1-2, 5.)  Soon thereafter, Congress

---

[1] The Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277,
§§ 1301 *et seq*., dissolved the USIA on October 1, 1999, and transferred its functions to the
Broadcasting Board of Governors.

appropriated funds for the relocation of Cuba broadcasting operations from Washington, D.C. to Miami, Florida.  (Def.'s Stmt. ¶ 3.)  *See* Omnibus Consolidated Rescissions and Appropriations Act, Pub. L. No. 104-134, 110 Stat. 1321-43 (1996).  In a June 14, 1996 canvass letter, USIA Director of Personnel and Administration Eva Jane Fritzman notified Office employees of the dates of the impending move and indicated that each would receive "a formal offer of transfer to Florida in the official position and grade/step . . . occup[ied] at the time of transfer."  (Pl.'s Ex. 2.) Fritzman also noted the agency's "commit[ment]" to those unwilling or unable to make the move, stating that it would "help[] . . . employees locate new jobs and . . . consider them for vacancies which occur in the International Broadcasting Bureau and USIA, including unannounced vacancies."  (*Id.*)  Plaintiff gave an equivocal response to the letter's request for a non-binding relocation decision, indicating that while she was interested in remaining in the District of Columbia, a number of factors -- "location, expenses, married couples" and others -- made it premature to decide at that time.  (*Id.*)

Ultimately, for reasons the parties dispute, plaintiff elected to remain in Washington, declining the agency's May 22, 1998 offer of a Miami position "at the same title, series, grade, status and organizational unit as the position [she] currently occup[ied] as documented in [her] Official Personnel Folder."  *See Black v. Tomlinson*, No. 00-cv-3036, at 3 (D.D.C. Sep. 23, 2002) (CKK) (Mem. Op.).  In a December 21, 2000 lawsuit, Black alleged that she had been subject to sexual harassment and a hostile work environment while employed at TV Marti, and as a result, she was constructively discharged.  *Id.* at 1.  Black complained that employees within the Office's Technical Operations Division -- two managers in particular -- consistently treated her differently on the basis of her sex, resulting in a hostile work environment.  *Id.* at 5.  In support of her

hostile environment and constructive discharge claims, she further contended that the agency had failed to offer her an equivalent management position in Miami due to its refusal to correct records in her Official Personnel Folder that classified her as a bargaining unit member instead of as management. *Id.* at 13. Black's claims were ultimately dismissed on summary judgment in a September 22, 2002 Memorandum Opinion, in which the Honorable Colleen Kollar-Kotelly concluded that the agency's failure to correct her personnel file prior to relocation did not amount to an adverse employment action, that she had not demonstrated aggravating circumstances in support of her constructive discharge claim, and that she had otherwise failed to exhaust administrative remedies. *Id.* at 16-19.

Black was separated from the agency on September 22, 1998, under general reduction-in-force procedures. (Pl.'s Exs. 3 and 4.) Under the terms of her separation, plaintiff was allowed two years' placement on the agency's reemployment priority list ("RPL"), a "mechanism . . . use[d] to give reemployment consideration to . . . former competitive service employees separated by reduction in force." *See* 5 C.F.R. § 330.201(a). As provided in the regulations governing RPLs, Black's listing entitled her to "priority consideration over certain outside job applicants," and at the agency's discretion, priority over internal candidates. *Id.* § 330.201(b). (*See also* Pl.'s Ex. 4; Pl.'s Ex. 24 at 72-74 (Welch deposition); Def.'s Ex. 1 ¶¶ 6-8 & n.3 (White declaration) ("The Agency's RPL was established and administered in accordance with 5 C.F.R. § 330.202."); Def.'s Ex. 2 at 17-21 (Czuczor deposition).) Black completed the required enrollment application only in part, indicating an interest in "any good job to retain salary," responding affirmatively to an inquiry into whether she was under "pay or grade retention," and leaving blank sections addressing other positions she believed herself qualified for, other

schedules she was available for, and other areas in which she would be willing to work.  (Pl.'s Ex. 4.)  *See* 5 C.F.R. § 330.202(a)(1) ("To be entered on the RPL, an eligible employee . . . must complete an application . . . specify[ing] the conditions under which he or she will accept employment, including grade, occupation, and minimum hours or work per week, in addition to positions at the same representative rate and type of work schedule . . . as the position from which the employee was or will be separated.").  Plaintiff never returned to employment with the agency.  Though she was referred for two or three interviews during her time on the list,[2] she was not offered any of the positions.  (*See* Compl. ¶ 14.)  Plaintiff's attempts to obtain an agency position through the standard application process were also unsuccessful.  (*Id*. ¶ 13.)[3]

A year into her placement on the reemployment priority list, Black concluded that the agency was refusing to offer her positions due to her prior engagement in protected activity.  In a September 20, 1999 letter to the USIA's Office of Civil Rights, Black asserted that the agency's continued failure to rehire her despite her qualifications and reemployment priority was a "retaliatory action" stemming from her prior filing of a discrimination suit.  (Pl.'s Ex. 10.)  The letter concluded with a request to "file a retaliation complaint against USIA personnel."  (*Id.*)

---

[2] In her deposition, plaintiff alleged that she was referred for only two positions, TV Production Specialist (PA-99-184) and Radio Production Specialist (B/P-99-14), though elsewhere she indicated that she was also contacted regarding a position as a TV Broadcast Technician (B/P-99-53).  (Pl.'s Ex. 20 at 177 (Black deposition); Pl.'s Ex. 5 at 3 (Black Affidavit).)  Defendant contends that Black was referred for three positions.  (Def.'s Response to Pl.'s Stmt. of Mat. Facts in Dispute ¶ 132 ("Pl's Stmt.").)

[3] She has since obtained full-time employment as a Senior Designer and Assistant Art Director with McNeil/Lehrer Productions.  (Pl.'s Stmt. ¶ 30.)

After the EEOC ruled against plaintiff in her initial discrimination case,[4] *see Black*, Civ. No.

00-3036, at 6, the International Broadcasting Bureau's Office of Civil Rights opened an

investigation into her second claim:

> Whether [Black] ha[d] been retaliated against when, as she alleges,
> she was not selected and rehired by the Agency based on her
> placement on the Agency's reemployment priority placement list, her
> seniority with the Agency, or for any positions for which she applied
> between September 22, 1998 and September 20, 1999.

(Pl.'s Ex. 7 (March 1, 2001 notice of revised claim accepted for investigation).)  An Administrative

Judge ultimately rejected plaintiff's retaliation claim in an opinion adopted by the agency on

September 11, 2002.  (Compl. Ex. A at 1.)  Plaintiff filed this action on December 16, 2002,

contending that defendant's denial of undefined "employment opportunities and other consideration

offered to other RIFFed personnel" was unlawful retaliation stemming from plaintiff's June 5, 1998

filing of a formal sex discrimination complaint.  (Compl. ¶ 16.)  *See Black*, Civ. No. 00-3036, at 6

(date of formal discrimination complaint filing).

## ANALYSIS

### I.    Legal Standard Under Title VII: Retaliation

Under the burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411

U.S. 792 (1973), a plaintiff seeking to establish a claim of retaliation under Title VII must

demonstrate that she engaged in a statutorily-protected activity, that she suffered an adverse

employment action, and that a causal connection exists between the two.  *Taylor v. Small*, 350

---

[4]Plaintiff's September 20, 1999 letter was forwarded to the investigator responsible for
her gender discrimination case.  (Pl.'s Ex. 10.)  After the investigator failed to make an
appropriate inquiry into the retaliation claim, the agency allowed Black to revive the allegation
by filing a January 19, 2001 complaint.  (*See* Compl. Ex. A at 1; Pl.'s Ex. 10.)

F.3d 1286, 1292 (D.C. Cir. 2003).  When the plaintiff claims that the retaliation involved a failure to hire through an application process, she must also demonstrate "that [she] applied for an available job . . . and . . . that [she] was qualified for that position," *Morgan v. Fed. Home Loan Mortg. Corp*., 328 F.3d 647, 651 (D.C. Cir. 2003), thereby eliminating "'the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.'"  *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977)).  "If the plaintiff establishes a *prima facie* case, the employer must then articulate a legitimate, nondiscriminatory reason for its actions.  The plaintiff must then demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory." *Taylor*, 350 F.3d at 1292 (internal quotations omitted).

"The *prima facie* case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 709, 715 (1983) (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)).  Thus, "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant." *Id.*; *see also Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1553-54 (D.C. Cir. 1997).  The question, in such cases, is whether a reasonable jury could conclude that plaintiff suffered retaliation.  *See id.*; *Waterhouse v. District of Columbia*, 298 F.3d 989, 993 (D.C. Cir. 2002) (proceeding to the "final question" of whether a reasonable jury could find plaintiff had been unlawfully discriminated against where

plaintiff did not argue that defendant had failed to proffer a legitimate reason for the challenged action).

Defendant contends that summary judgment is appropriate on a number of grounds.  First, defendant argues that plaintiff is unable to establish a *prima facie* case of retaliation because the selecting officials were unaware of her prior protected conduct, she was not qualified for the positions at issue, the vacancy alleged did not exist, or the agency cancelled the relevant vacancy announcement.  (Def.'s Mem. in Supp. at 5-9.)  According to defendant, these and other factors also provide legitimate, nondiscriminatory reasons for the actions at issue, as the agency declined to hire or refer plaintiff for various positions due either to her lack of qualification, the limited range of interest indicated in her RPL application, or its cancellation of the vacancy announcements at issue.  (*Id*. at 9-11.)  Finally, defendant contends that plaintiff cannot establish pretext since agency officials provided her with the requisite priority of consideration, the agency did not hire and train other unqualified applicants for positions plaintiff was denied, the selecting officials judged plaintiff's qualifications correctly and did not harbor retaliatory motives, plaintiff was unqualified for many of the contested positions, and plaintiff had indicated a lack of interest in jobs falling below her previous salary grade.  (*Id*. at 11-14.)

## II.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute as to a material fact -- one that "might affect the outcome of the suit under the governing law" -- is

"genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A moving party is therefore entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse*, 298 F.3d at 992 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When considering a motion for summary judgment, the Court must draw every justifiable inference in favor of the nonmoving party and accept that party's evidence as true, while abstaining from credibility determinations and any weighing of the evidence. *Anderson*, 477 U.S. at 255; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).  The nonmovant must offer more than unsupported allegations or denials, however -- affidavits or other competent evidence setting forth specific facts on which a reasonable jury could find in her favor are required if summary judgment is to be avoided. *Greene v. Dalton*, 164 F.3d 671, 674-75 (D.C. Cir. 1999).  "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998), *aff'd*, 1999 WL 825425 (D.C. Cir. 1999) (citation omitted).

The procedures governing motions for summary judgment are further defined in this Court's local rules.  Under Local Civil Rule 56.1, "[e]ach motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no

genuine issue, which shall include references to the parts of the record relied on to support the statement." Local Civ. R. 56.1. In opposing a motion for summary judgment, a party is accordingly required to file "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." *Id.* The Court is entitled to treat as admitted those facts identified in the moving party's statement and not controverted in that of the nonmovant. *Id.* In conjunction with the filing of a twenty-four page opposition which is often devoid of citations to either the record or controlling authority, plaintiff has provided the Court with a forty-page rambling and disjointed "Statement of Material Facts in Dispute." Plaintiff's statement -- which often consists of nothing more than a summation of Black's deposition testimony and is without any specification of the portions of defendant's statement of facts it purports to contest -- is insufficient under the rules and has complicated the Court's ability to resolve this case expeditiously. The Court has nonetheless reviewed the entire record and has determined that there are no facts in dispute that would preclude the granting of summary judgment.[5]

## III.   Nonselection

Though plaintiff's complaint does not reference any of the specific positions which are at issue, eight have been identified by the parties. (*See* Def.'s Mem. in Supp. at 6-8.) Five of the positions were allegedly denied to plaintiff after she submitted an application through standard procedures: (1) Special Assistant (vacancy announcement B/P-98-68); (2) Staff Assistant, GS-

---

[5]Plaintiff's failure to comply with this Court's local rules was also noted in the Memorandum Opinion granting defendant summary judgment on plaintiff's sexual harassment, hostile work environment, and constructive discharge claims. *See Black*, Civ. No. 00-3036, at 6 n.4.

12/13 (vacancy announcement B/P-98-120); (3) Special Projects Officer, GS-13 (vacancy announcement B/P-99-9); (4) Supervisory TV Broadcast Technician, GS-14 (vacancy announcement B/P-98-21); and (5) Video Production Specialist (vacancy announcement INV-056-98.  (*See* Def.'s Rep. at 2; Pl.'s Ex. 5 at 2 (Black Affidavit).)  While there is arguably some disagreement as to one of the positions (*see supra* note 2), the remaining three appear to have been referred to plaintiff under RPL procedures: (6) TV Production Specialist, GS-9/11 (vacancy announcement B/P-99-184); (7) Radio Production Specialist, GS-12 (vacancy announcement B/P-99-14); and (8) TV Broadcast Technician (vacancy announcement B/P-99-53).  (*See* Def.'s Response to Pl.'s Stmt. ¶ 132 (asserting that plaintiff was referred for three positions under RPL procedures); Pl.'s Stmt. ¶ 132 (asserting that plaintiff was only referred for the TV Production Specialist (B/P-99-184) and Radio Production Specialist (B/P-99-14) positions under the RPL); *but see* Pl's Ex. 5 at 3 (plaintiff's affidavit indicating that she was contacted for three positions, including that of TV Broadcast Technician (B/P-99-53)); Pl.'s Ex. 14 (plaintiff's note indicating that she was referred for the TV Broadcast Technician (B/P-99-53) position under the RPL).)  In addition to these, plaintiff claims that defendant retaliated by denying her temporary contract work available at Worldnet as well as freelance graphic design work available through Art Director Louise Coleman-Brown.  (*See* Pl.'s Opp'n at 12, 19, 25-26.)

## A.    Application Positions

Plaintiff has failed to establish a *prima facie* case of retaliation with regard to each of the positions for which she claims to have applied.

### 1.    Special Assistant (B/P-98-68) and Staff Assistant (B/P-98-120)

According to plaintiff, defendant retaliated against her by cancelling two positions for

which she applied and was qualified: Special Assistant (B/P-98-68) and Staff Assistant (B/P-98-120). (*See* Pl.'s Opp'n at 20 ("It is apparent that instead of hiring Plaintiff for vacant positions, the Defendant canceled the job vacancies for which Plaintiff would be most qualified."); *id.* at 20-21 ("As regards any vacant position cancelled or not filled, the Defendant has not offered any legitimate non-discriminatory reason for its actions, and its actions indicate reprisal given the closeness between Plaintiff's prior EEO activity and the cancellations of positions and the failure to advise Plaintiff of vacancies."); Pl.'s Ex. 20 at 199 (Black deposition) (stating that two positions Black "kn[e]w [she] was qualified for" were cancelled without explanation); *see also* Def.'s Ex. 1 ¶¶ 10-11 (White Declaration) (stating that neither position was filled); Pl.'s Ex. 47 (November 23, 1998 letter notifying plaintiff that the Staff Assistant announcement had been cancelled).) Plaintiff, however, concedes that the positions were never filled and offers no evidence to suggest that defendant continued to solicit applications after declining to hire her. (*See id.*) *See also Morgan*, 328 F.3d at 651 (plaintiff alleging a retaliatory failure to hire must show, among other things, that she "applied for an available job"). On the contrary, the record demonstrates that defendant anticipated the cancellation of at least one of the positions at the time it was first advertised since the vacancy announcement for the job of Staff Assistant stated that "[b]udgetary conditions" will potentially affect the filling of the position. (Pl.'s Ex. 45.)

Thus, Black has "failed to eliminate one of the most common legitimate nondiscriminatory reasons for a failure to hire: the absence of a vacancy." *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1152 (D.C. Cir. 2004); *cf. Carter v. George Washington Univ.*, 387 F.3d 872, 883 (D.C. Cir. 2004) (noting that plaintiff alleging a discriminatory failure to hire had to demonstrate that "the position was not withdrawn simply for lack of a vacancy," a

requirement satisfied by evidence that "the position not only remained unfilled, but, as shown by [its] later efforts to bring back [a] former employee, the [employer] still needed someone to occupy the position").  Defendant is therefore entitled to summary judgment on these two claims.[6/]

_____

[6/]In addition to the undisputed fact that these positions were never filled, defendant correctly argues that plaintiff failed to timely exhaust administrative remedies with regard to the Special Assistant position (B/P-98-68) and Staff Assistant position (B/P-98-120). (*See* Def.'s Rep. at 3-5.)  Under 29 C.F.R. § 1614.105(a), aggrieved persons who believe they have been discriminated against in the federal sector are required to initiate contact with an EEO counselor "within 45 days of the effective date of [a] . . . personnel action," a deadline that is to be extended only where "the individual shows that . . . she did not know and reasonably should not have . . . known that the . . . personnel action occurred." *Id.*; *see also Keeley v. Small*, 391 F. Supp. 2d 30, 40 (D.D.C. 2005) ("Generally, a Title VII plaintiff must exhaust his administrative remedies prior to filing an action in federal court.  This requirement also applies to federal employees, who must contact an EEO counselor within 45 days of the alleged personnel action.")  Failure to timely initiate the administrative process is fatal to a plaintiff's claims.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) (precluding recovery for discrete acts of discrimination or retaliation not raised in an EEOC charge within the deadlines of 42 U.S.C. § 2000e-5(e)); *Velikonja v. Mueller*, 315 F. Supp. 2d 66, 74 n.3 (D.D.C. 2004) (noting the applicability of *Morgan*'s principles to the 45-day deadline in the federal employment context).

Plaintiff first brought her retaliation allegation to the attention of the agency in a September 20, 1999 letter to the USIA's Office of Civil Rights. (*See* Pl.'s Ex. 10.)  She has failed to demonstrate a reason for enlarging the 45-day window of § 1614.105(a) with respect to either position.  Black was notified in a November 23, 1998 letter -- nearly ten months prior to her request to file a retaliation complaint -- that the announcement for the Staff Assistant (B/P-98-120) position had been cancelled and would not be filled. (Pl.'s Ex. 47; *see also* Def.'s Ex. 4 at J8-E (vacancy announcement with September 21, 1998 closing date).)  While there is no similar record with respect to the Special Assistant (B/P-98-68) position, plaintiff should reasonably have known of her nonselection more than 45 days prior to September 20, 1999 -- the application period for the position closed on June 22, 1998, months before her separation from the agency. (*See* Def.'s Ex. 4 at J8 (B/P-98-68 vacancy announcement).)

The same deficiency is evident with regard to two other positions: Special Projects Officer (B/P-99-9) and TV Broadcast Technician (B/P-99-53).  Black was notified in a February 19, 1999 letter from Personnel Management Specialist Tom Donohoe that she would not be considered for the Special Projects Officer position because she was "outside the Area of Consideration as listed on the Vacancy Announcement." (Pl.'s Ex. 12; *see also* Def.'s Ex. 4 at J8-C (B/P-99-9 vacancy announcement with February 9, 1999 closing date.)  In a June 15, 1999 letter from Personnel Management Specialist Susan King, plaintiff was informed that "another candidate ha[d] been selected to fill the [TV Broadcast Technician] position." (Pl.'s Ex. 14; *see also* Def.'s Ex. 4 at J8-A (B/P-99-53 vacancy announcement with May 11, 1999 closing date).)

### 2.      Special Projects Officer (B/P-99-9)

Plaintiff has also failed to establish a *prima facie* case of retaliation with respect to the

position of Special Projects Officer (B/P-99-9).  As Black was informed in a February 19, 1999

letter from Personnel Management Specialist Tom Donahue, she was not eligible to apply for the

position since she fell "outside the Area of Consideration" -- the announcement was open to

"current career or career-conditional employees in the competitive service of the USIA, State,

and ACDA agencies *only*."  (Def.'s Ex. 4 at J8-C (letter and vacancy announcement) (emphasis in

original).)  Black does not challenge these facts, and thus, summary judgment is warranted.[7/]

### 3.      Supervisory TV Broadcast Technician (B/P-98-21)

Plaintiff also applied for the position of Supervisory TV Broadcast Technician (B/P-98-

21).  (*See* Pl.'s Ex. 5 at 2 (Black Affidavit) (plaintiff's statement that she applied for vacancy

announcement B/P-98-21, which concerned a position she could not recall); Def.'s Ex. 4 at J8-D

(promotion certificate for B/P-98-21 indicating that plaintiff was interviewed for the position).)

Defendants, however, could not have retaliated against plaintiff in selecting another candidate --

the application period for the position closed on March 6, 1998, and a hiring decision was made

by April 7, 1998, two months prior to Black's June 5, 1998 filing of her first discrimination

complaint (and, for that matter, before plaintiff first contacted an EEO Counselor on April 20,

1998).  (*See* Def.'s Ex. 4 at J8-D (vacancy announcement and promotion certificate).)  *See Black*,

---

Black's handwritten note at the foot of the June 15 letter -- stating that "I was referred from
Re-employment Priority List - Tommy Donahoe [sic] contends that I am not eligible under
TcPIP" -- clearly evidences a belief at the time of the letter's receipt that the agency had failed to
give her proper consideration under RPL procedures.  (*See* Pl.'s Ex. 14.)

[7/]This claim would also be barred on exhaustion grounds.  *See supra* note 6.

-13-

Civ. No. 00-3036, at 6.  For this reason, as well as others,[8/] this claim must fail.

### 4.        Video Production Specialist (INV-056-98)

Plaintiff alleges in her March 15, 2001 affidavit that she applied for a Video Production Specialist position listed under vacancy announcement number INV-056-98.  (Pl.'s Ex. 5 at 2 (Black Affidavit).)  No other information about the alleged vacancy is provided.  Defendant contends that it has no record of any such position, noting that both the announcement number and job title are inconsistent with those used by the agency.  (*See* Def.'s Rep. at 5.)  In response, plaintiff has failed to offer evidence regarding the existence of such a position, relying instead on the argument that "two vacancy announcements . . . establish[] that there were vacancy announcements under 'PA'-99-184 and 'PA'-00-40" and thus "'B/P' was not the only letter used for vacancy announcements, . . . contrary to what the defendant has stated in its Motion."  (Pl.'s Opp'n at 24.)  While the record does reflect defendant's use of both "B/P" and "PA" in its vacancy announcement numbers, this fact is not sufficient to support a reasonable jury in finding that defendant retaliated against plaintiff by failing to hire her as a Video Production Specialist.  There being no evidence regarding the qualifications demanded of applicants for the alleged position, a reasonable jury could not find that plaintiff has established a *prima facie* case with respect to this claim.

### B.        RPL Positions

With regard to each of the positions referred to Black during her time on the agency's

---

[8/]The impossibility of a retaliatory motive aside, plaintiff has made no attempt to demonstrate that she was qualified for the position, which required "[i]n-depth knowledge of television signal routing via transmission systems such as microwave, fiber and domestic and international satellites" and "[e]xpertise in networking of wide band digital and analog systems." (*See* Def.'s Ex. 4 at J8-D.)  In addition, it appears that plaintiff is barred on exhaustion grounds. *See supra* note 6.

reemployment priority list, defendant contends that plaintiff was not hired due to her lack of the requisite qualifications and not as a result of her protected activity.  (*See* Def.'s Mot. at 9-11.)  As defendant has accordingly met its burden of proffering a legitimate reason for the challenged actions, the Court need not be detained by the question of whether plaintiff has established a *prima facie* case for each of the claims.  *See Aikens*, 460 U.S. at 715 ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.")  Thus, after addressing the regulations governing the agency's administration of its priority list, the Court will turn to the issue of whether a reasonable jury could find in plaintiff's favor on her claim of unlawful retaliation.

### 1.    RPL Regulations

As defined by 5 C.F.R. § 330.201(a), "[t]he reemployment priority list (RPL) is the mechanism agencies use to give reemployment consideration to their former competitive service employees separated by reduction in force (RIF) . . . ."  *Id.*  In the absence of an alternate placement program, "[e]ach agency is required to establish and maintain a reemployment priority list for each commuting area in which it separates eligible competitive service employees by RIF."  *Id.* § 330.201(b)-(c).  "In filling vacancies, the agency must give RPL registrants priority consideration over certain outside job applicants and, if it chooses, also may consider RPL registrants before considering internal candidates."  *Id.* § 330.201(a).

Employees separated from any agency as the result of a reduction in force are not automatically enrolled on the agency's priority list.  Rather, "[t]o be entered on the RPL, an eligible employee . . . must complete [the] application prescribed by the employing agency and inform the agency of any significant changes in the information provided." *Id.* § 330.202(a)(1); *see also id.* ("An employee who fails to submit a timely application is not entitled to be placed on the RPL.").  The content and corresponding purpose of an agency's RPL application is addressed in § 303.202, which states that "[the] application must provide for the employee to specify the conditions under which he or she will accept employment, including grade, occupation, and minimum hours or work per week, in addition to positions at the same representative rate and type of work schedule (e.g., full-time, part-time, seasonal, intermittent, on-call, etc.) as the position from which the employee was or will be separated." *Id.*  (*See* Pl.'s Ex. 24 at 176 (Welch deposition) (stating that the reemployment application "indicate[s] the person's interest in being considered under the reemployment priority program and for what jobs"); *cf.* Pl.'s Stmt. ¶ 158 ("When plaintiff submitted her application for the Reemployment Priority List, she was not required to state on the application the positions she was willing to be considered for.").)  With some exceptions, "[w]hen a qualified individual is available on an agency's RPL, the agency may not make a final commitment to an individual not on the RPL to fill a permanent or temporary competitive service position by . . . [a] new appointment . . . or . . . [t]ransfer or reemployment." *Id.* § 330.205(b); *see also id.* § 330.208(a) (providing that "an individual is considered qualified for a position if . . . she," first, "[m]eets OPM-established or approved qualification standards and requirements for the position, including any minimum educational requirements, and any selection placement factors established by the agency;" second, "[i]s physically qualified, with

-16-

reasonable accommodation where appropriate, to perform the duties of the position;" third,

"[m]eets any special qualifying condition that OPM has approved for the position;" and, fourth,

"[m]eets any other applicable requirement for appointment to the competitive service.").

### 2.   TV Production Specialist (PA-99-184)

Plaintiff was referred for the position of TV Production Specialist (PA-99-184).  In a

December 29, 1999 vacancy announcement, the agency indicated that candidates for the job must

have "[h]ands-on experience and knowledge of various graphics software, hardware and

peripheral devices of the Chyron INFINIT, MAX or MAXINE," noting that the position involved

Chyron operation "on live news shows and live shows in a major television market."  (Pl.'s Ex.

15.)  The announcement also stated that the "[b]est qualified candidates may be evaluated to

confirm [their] level of ability on a Chyron MAX."  (*Id.*)  Black interviewed for the position with

three agency officials -- Worldnet Chief of Staff Michael Czuczor, Acting Worldnet Director

Marie Skiba, and Graphics Supervisor Louise Coleman-Brown -- on February 2, 2000.  (Czuczor

Dep. Ex. 3; *see also* Pl.'s Ex. 20 at 123-25 (Black deposition) (indicating that Michael Czuczor,

Michele Mitchell and Marie Skiba interviewed plaintiff for the position, but nonetheless

discussing questions asked by Czuczor, Skiba and Coleman-Brown).)  In a February 3, 2000

memorandum, Czuczor notified Personnel Operations Division Chief Brenson Long that while

plaintiff indicated that she had "supervised people operating Character Generators and d[one]

research on Character Generators for procurement purposes," she admitted that she had "not

touched a Character Generator in over 11 years" nor operated a Chyron MAX on any occasion.

(*Id.*)  Czuczor also noted that plaintiff was unable to answer a "sample Chyron question" and

answered only six of fourteen questions on "basic graphics and television procedures" correctly.

(*Id.*)  As "[t]he job require[d] an experienced Chyron Operator who can operate the Chyron MAX on live shows and news shows and perform other related graphic software functions with th[e] machine[,]" Czuczor, Skiba and Coleman-Brown concluded that plaintiff was "not qualified" for the position.  (*Id.*; *see also* Def.'s Ex. 2 at 33-34 (Czuczor deposition); Def.'s Ex. 4 at G3 (Coleman-Brown Affidavit).)

Plaintiff contends that the agency's decision not to hire her as a TV Production Specialist was the result of retaliatory motives rather than a lack of qualifications on her part.  While conceding that she told the interviewers she had never operated a Chyron MAX in a live situation and was unable to answer "some" questions about the model, Black asserts that she had arranged Chyron training for other employees and accordingly "learned what the [machine's] capabilities were in great detail[,] . . . push[ing] buttons to see that it did what it was supposed to do."  (Pl.'s Ex. 20 at 124, 126 (Black deposition).)  Plaintiff also challenges some of the statements made in Czuczor's February 3, 2000 memorandum, asserting that she did not state that she had not operated a Character Generator in more than eleven years and that Coleman-Brown had not asked her a Chyron question but rather one about the "obsolete" color wheel.  (*Id.* at 123, 125.) Ultimately, plaintiff argues that the Chyron is a "glorified typewriter," that the job was "so far below [her] level of skill" that she "surely" could have performed it, and that -- as she claims to have told the interviewers -- she could have made the machine "sing" after "two days with a manual[.]"  (*Id.* at 127-30 ("The animators that I operate are so highly sophisticated that this is a joke.  They're telling me I couldn't type, save and hit recall.  This is a joke.").)

Plaintiff's arguments and assertions regarding her own abilities are not sufficient to create a genuine issue as to her qualification for the position.  *See Brown v. Brody*, 199 F.3d 446,

459-60 ("[A] plaintiff's mere speculations are 'insufficient to create a genuine issue of fact

regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment.'")

(quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).  By plaintiff's

own admission, she lacked the requisite familiarity with the Chyron MAX and would have

required training in order to perform the job.  (*Id.* at 123-30; *see also* Pl.'s Ex. 15 (vacancy

announcement indicating that the "[b]est qualified candidates may be evaluated to confirm [their]

level of ability on a Chyron MAX").)  Plaintiff's suggestion that defendant engaged in retaliatory

conduct by refusing to provide her with training is without merit.  As a registrant on the priority

list, Black was entitled to placement only in positions for which she was qualified.  *See* 5 C.F.R.

§ 330.205(b).  Moreover, plaintiff has offered no evidence indicating that the position was

ultimately filled by an applicant who required training on the machine.  (*See* Def.'s Ex. 2 at 40,

73 (Czuczor deposition) (indicating that agency had not, in his recollection, provided training to

a new employee).)  Accordingly, defendant is entitled to summary judgment with respect to this

claim.

### 3.    Radio Production Specialist (B/P-99-14)

Plaintiff's arguments regarding her qualification for the position of Radio Production

Specialist (B/P-99-14) are of a similar tenor.  According to a February 9, 1999 vacancy

announcement, the position involved the production of both analog and digital news material, as

well as the training of staff on the use of "digital audio workstations," thus requiring applicants to

have one year of specialized experience and a familiarity with "the latest techniques."  (Def.'s Ex.

3 (Albritton-Pollock Declaration Exhibit B).)  In a memorandum written after his interview with

Black, Robert Mackay reported that plaintiff lacked "professional radio experience" and --

though "she expressed a willingness to learn" -- had "acknowledged that most of her recent work had been in television as a graphic artist." (*Id.* (Albritton-Pollock Declaration Exhibit C).) Mackay also noted that plaintiff "ha[d] never worked a digital audio editing machine -- a key part of the job." (*Id.*)

Plaintiff contends that she was qualified for the position, claiming that she had operated an identical analog device more than a decade before while in college, that she had done "extensive research on digital audio[,]" and that animators she had worked with "had audio capabilities and . . . were digital." (Pl.'s Ex. 20 at 86-90 (Black deposition).) Plaintiff adds that the equipment she had used in her previous job was "much more highly technical" than that involved in the Radio Production Specialist position. (*Id.* at 92.) Plaintiff's assertions are again insufficient to create a genuine issue as to her qualifications for the position as she has failed to demonstrate that she possessed the experience demanded by the vacancy announcement. Moreover, plaintiff has offered no evidence upon which a jury could infer that anyone involved in the hiring decision -- Voice of America employees Robert Mackay, Sonia James and Cynthia Krasinski -- knew or likely would have known of her protected activity. (*See* Pl.'s Stmt. at 20 (omitting any reference to selectors' knowledge); Def.'s Ex. 3 (Janice Albritton-Pollock Declaration).) Accordingly, defendant is entitled to summary judgment with respect to this claim.

### 4.    TV Broadcast Technician (B/P-99-53)

Plaintiff also interviewed for the position of TV Broadcast Technician (B/P-99-53). In an April 28, 1999 vacancy announcement, the agency listed a number of "mandatory" requirements for the job: "[d]emonstrated experience as a videotape operator/editor with both analog and

digital systems[;]" an "[a]bility to edit with the AVID non-linear Media Composer and/or the AVIS NewsCutter editing systems[;]" a "[t]horough understanding of all the International broadcast standards and ability to make technically correct videotape duplications into any standard[;]" a "[d]emonstrated knowledge of a wide range of complex television production systems, including audio mixers, analog and digital video switchers, character generators, videotape recorders, studio cameras, studio lighting, digital video effects systems, and associated technical systems[;]" a "[d]emonstrated knowledge of TV signal measurement[;]" an "[a]bility to make the appropriate measurements utilizing sophisticated test instruments such as waveform oscilloscopes and vector scopes to analyze, correctly set-up and manage incoming, outgoing and internal distribution of the TV signals[;]" "[s]kill in preventive and corrective maintenance including individual component level on a wide variety of professional broadcasting equipment[;]" and an "[a]bility to test, repair and calibrate broadcast equipment to meet exacting U.S. and international broadcasting standards."  (Pl.'s Ex. 22.)  After interviewing plaintiff for the position, Michele Mitchell, Director of Worldnet's Technical Operations Directorate, reported that Black had answered only twenty percent of "[a] series of basic electronic and broadcasting questions" correctly.  (Black Dep. Ex. 1A.)  "At this level of knowledge," Mitchell stated, "she would rank in the category of a GS-7 trainee" and "would have to attend and pass an electronics course and train for three years within the various branches of TV technical before she would be considered a GS-12 journeyman level technician."  (*Id.*)  Mitchell also indicated that plaintiff had failed to "answer the basic questions asked of her regarding video levels or scopes."  (*Id.*)  In conclusion, Mitchell stated that she could not accept plaintiff as "qualified" for the position.  (*Id.*)

While plaintiff challenges Mitchell's memorandum as both inaccurate and unrelated to the TV Broadcast Technician position,[9] its conclusion is consistent with the requirements of the job and plaintiff's prior work experience.  In the one-page supplemental qualifications statement plaintiff submitted in support of her candidacy for the position, she makes no reference to a number of the "mandatory" factors listed in the vacancy announcement, including a "[t]horough understanding of all the International broadcast standards[,]" the "ability to make technically correct videotape duplications into any standard[,]" and the ability to "manage incoming, outgoing and internal distribution of the TV signals[.]"  (*See* Def.'s Ex. 4 at J8-B; Pl.'s Ex. 22.) Moreover, plaintiff's own characterization of her relevant experience does not rise to the level of expertise demanded in the announcement.  In response to the requirement that candidates have "[d]emonstrated knowledge of a wide range of complex television production systems," Black noted that she had previously "supervised . . . studio operations" and was therefore "familiar with [the relevant] pieces of equipment and their capabilities."  (Def.'s Ex. 4 at J8-B.)  As the vacancy announcement makes clear that the position involved the operation of all such equipment (*see* Pl.'s Ex. 22), plaintiff's sense of familiarity and experience as a supervisor falls short of the job's requirements.  Similarly, Black's unelaborated assertion that she had prior experience "calibrat[ing], troubleshoot[ing], and mak[ing] some repairs" is not sufficient to suggest an

---

[9]Plaintiff asserts that there is "no evidence" connecting Mitchell's memorandum to the TV Broadcasting Technician position, protesting that she has no way of knowing what job it concerns.  (Pl.'s Stmt. ¶ 102; Pl.'s Ex. 20 at 117 (Black deposition).)  The memorandum corresponds perfectly with the vacancy announcement for B/P-99-53, thus dispelling any basis for confusion.  Plaintiff also argues that it was "ridiculous" to state that she was unable to answer basic scope questions as she "trained people on those" and claims that she was able to answer all questions regarding industry standards.  (Pl.'s Stmt. ¶¶ 102-105.)  Plaintiff's assertions regarding the sufficiency of her answers do not create a genuine issue for trial, for, as discussed above, she has failed to demonstrate that she was in fact qualified for the position.

"[a]bility to test, repair and calibrate broadcast equipment to meet exacting U.S. and international broadcasting standards."  (*See id.*)  As evident in her statement's reference to the "creative quality of [her] work" (*see* Def.'s Ex. J8-B), Black's prior experience was rooted in graphic arts rather than broadcasting technology.  Plaintiff, in short, has failed to demonstrate her qualifications for the job.

Not surprisingly, plaintiff's arguments regarding the TV Broadcast Technician position turn not on her prior experience but rather on the agency's handling of the announcement. According to plaintiff, defendant retaliated against her by hiring an outside candidate for the job despite a letter from Personnel Management Specialist Susan King notifying Black that she was "among the qualified applicants referred" for the position.  (*See* Pl.'s Opp'n at 15; Pl.'s Ex. 14.) King's letter, however, is not sufficient to raise a genuine issue as to whether plaintiff was in fact qualified for the job.  On its face, the letter appears to indicate only that personnel had deemed Black minimally qualified for purposes of referring her to the selecting officials responsible for the position, stating that plaintiff was "among the qualified applicants referred on an ICTAP Certificate" but that "another candidate ha[d] been selected" for the job.  (Pl.'s Ex. 14.)  Such a reading is consistent with the remainder of the record, including King's own affidavit, which contains no evidence suggesting that plaintiff was or should have been determined sufficiently qualified to actually be hired for the position.  (*See* Pl.'s Ex. 13 (King Affidavit) ("It is my understanding that Ms. Black went for the interview but was found not qualified.").)[10]  As plaintiff has failed to demonstrate that she was qualified for the position, defendant is entitled to summary judgment on the claim.

_____

[10]As explained *supra* note 6, plaintiff also failed to exhaust her administrative remedies with respect to this position and is thus barred from litigating it here.

5.        **Temporary Positions**

Plaintiff's final nonselection claims involve temporary employment allegedly available at
Worldnet and freelance contracting work available through Louise Coleman-Brown.  (*See* Pl.'s
Opp'n at 12, 20, 24-26.)  First, according to the affidavit of Edward Clark, a former Worldnet
employee, "there were persons hired in Broadcast Operations as contractors" for temporary
evening and midnight shifts at some point in 1998.  (Pl.'s Ex. 18.)  "It is [Clark's] understanding
that Ms. Black and other former TV Marti employees were referred [to Jim Ryan and Steve
Freidman] as potential applicants for temporary employment."  (*Id.*)  According to Debra
Schackner, another Worldnet employee, Friedman noted at the time that "he was unable to hire
[Black] since there were persons above him that were against her being hired."  (Def.'s Ex. 4 at
I3.)  Second, Louise Coleman-Brown acknowledges in her own affidavit that she was authorized
to hire "any" outside freelance graphics contractors in 1998.  (Def.'s Ex. 4 at G3.)  According to
Coleman-Brown, she did not consider Black for the contract work, noting that she does not recall
plaintiff's name being mentioned and, regardless, she "wasn't satisfied" with what work of
Black's she had seen.  (*Id.*)

Plaintiff contends that her nonselection for these assignments constituted retaliation.
With respect to the contracting work at Worldnet, plaintiff argues that Schackner's affidavit is
"clear . . . evidence of the retaliation plaintiff was subjected to because of prior protected
activity."  (Pl.'s Opp'n at 20.)  With respect to the projects available through Louise Coleman-
Brown, plaintiff argues that Coleman-Brown knew both of her protected activity and her "skills
and experience, since plaintiff received an award for network design from USIA," thus
demonstrating that Coleman-Brown's stated reasons for hiring others as contractors were

pretextual.  (*Id.* at 25-26.)

Plaintiff has failed to introduce evidence sufficient to support a reasonable jury in finding that defendant engaged in retaliation by refusing to offer her the contracting work at Worldnet.[11] As noted above, a plaintiff alleging retaliation in "the form of a failure to hire" must demonstrate that "[s]he was qualified for th[e] position."  *Morgan*, 328 F.3d at 651.  On the present record, there is simply insufficient evidence to support a finding as to what the requisite qualifications for the Worldnet positions were, much less whether plaintiff satisfied them.  (*See* Pl.'s Ex. 18.) Notably, plaintiff offers no arguments regarding her qualifications for the positions, relying on nothing more than an assertion that she was in fact available and "qualified."  (*See* Pl.'s Opp'n at 12 ("Plaintiff was not called for this work despite the fact that she had made it clear all around that she needed work[.]"); *id.* at  20 ("Although qualified, plaintiff was never called to work any of the assignments.").)  *See Greene*, 164 F.3d at 675.

With regard to the projects available through Louise Coleman-Brown, plaintiff has failed to introduce sufficient evidence to support a reasonable jury in concluding that Coleman-Brown declined to provide plaintiff with freelance work based on her prior engagement in protected activity.  Even assuming Coleman-Brown was aware that plaintiff had both received a design award and filed a discrimination complaint, such evidence is insufficient to support the inference of retaliation plaintiff advocates.  (*See* Pl.'s Opp'n at 24-25 ("The defendant's articulated reason for why Ms. Louise Coleman-Brown did not choose Plaintiff is inconsistent with the experience

---

[11]Plaintiff also overstates the clarity of the Schackner affidavit and related evidence. While plaintiff has offered evidence indicating that there were persons in the agency that were "against her being hired" and "didn't like her" (*see* Def.'s Ex. 4 at I3), there is no indication in the record whether such sentiments were the result of plaintiff's protected activity or other, unprotected conduct.

and skill Plaintiff possessed.  It is not logical and is wholly inconsistent with Plaintiff's proven skills and abilities.  The reasons articulated by the defendant were presented to mask the intentional discrimination.").)  Coleman-Brown was given discretion to select artists for "freelance graphics work" and, according to her affidavit, she had not considered Black nor was she satisfied with her earlier work.  (Def.'s Ex. 4 at G3.)  Coleman-Brown's aesthetic judgment is by no means discredited by whatever recognition plaintiff's work had received and, even if Coleman-Brown was aware of plaintiff's prior protected activity, there is insufficient evidence to overcome defendant's showing of legitimate, nonretaliatory reasons for plaintiff's nonselection.

## IV.   Nonreferrals

In addition to the above positions, Black contends that defendant retaliated against her by failing to refer her for nearly thirty vacancies announced while she was a registrant on the priority list.  (*See* Pl.'s Opp'n at 10 ("There were approximately 29 or more positions plaintiff identified as positions she was qualified to hold."); Pl's Stmt. ¶¶ 128-30.)  Plaintiff offers a number of arguments in support of her claim.  First, Black asserts that "[i]t is uncontroverted that [she] was supposed to be referred for positions she was deemed minimally qualified to fill that came open while she was on the RPL[,]" and thus -- as she asserts, without explication, that she was qualified for each of the positions identified -- the agency's failure to advise her of the openings constituted retaliation.  (Pl.'s Opp'n at 8, 10.)  Second, plaintiff states that she benefited from pay retention in the wake of her separation from the agency and accordingly "would have taken any position just to get her foot back into the door," undermining defendant's arguments that she had limited the scope of her interest in her reemployment application.  (*Id.* at 11, 13-14.)  In arguing that summary judgment is appropriate with respect to each of the nonreferrals, defendant

-26-

contends that the positions were either outside plaintiff's area of qualification or stated interest. (Def.'s Mem. in Supp. at 11; Def.'s Rep. at 7-10.)

As the record is insufficient to support a reasonable jury in finding that defendant retaliated against plaintiff in the administration of its reemployment priority list, defendant is entitled to summary judgment with respect to plaintiff's nonreferral claims.  First, three[12] of the twenty-eight positions were located outside of Washington, D.C. -- one in Miami, the second in Saipan, and the last in Los Angeles.  (*See* Dohonoe Dep. Exs. 9, 10, and 24.)  Because Black was entitled to consideration only for employment within her "commuting area," the agency acted in accordance with RPL regulations in declining to refer her for these positions.  *See* 5 C.F.R. § 330.206(a)(1) ("An eligible employee under § 330.203 is entitled to consideration for positions in the commuting area for which qualified . . . ."); *id.* § 330.206(a)(3) (providing, with two narrow exceptions inapplicable here, that "[a]n eligible employee may be entered on the RPL only for the commuting area in which separated and may not apply for the RPL in any other location").  Moreover, Black's reemployment application gives no indication of a willingness to relocate, since the section relating to employment outside of Washington was left blank.  (*See* Pl.'s Ex. 4.)  Second, twelve[13] of the vacancy announcements were open only to current

---

[12] Personnel Management Specialist, GS-12/13 (PA-99-166) (Miami) (Donohoe Dep. Ex. 9); Administrative Officer, GS-9/11 (B/P-99-160) (Saipan) (Donohoe Dep. Ex. 10); Program Assistant (Typing), GS-6 (B/P-99-38) (Los Angeles) (Donohoe Dep. Ex. 24).

[13] Supervisory TV Broadcast Technician, GS-13 (PA-99-174) (Donohoe Dep. Ex. 8); Clerk Typist, GS-5 (Donohoe Dep. Ex. 11); Supervisory TV Broadcast Technician, GS-13 (B/P-99-131) (Donohoe Dep. Ex. 13); Office Assistant, GS-8 (B/P-99-106) (Donohoe Dep. Ex. 15); Administrative Assistant, GS-9 (B/P-99-73) (Donohoe Dep. Ex. 16); Administrative Assistant, GS-9 (B/P-99-52) (Donohoe Dep. Ex. 21); Office Assistant (Typing), GS-6/7 (B/P-99-49) (Donohoe Dep. Ex. 22); Procurement Analyst, GS-12 (B/P-99-20) (Donohoe Dep. Ex. 30); Purchasing Agent, GS-9 (B/P-99-18) (Donohoe Dep. Ex. 31); Office Assistant (Typing), GS-5 (B/P-99-13) (Donohoe Dep. Ex. 32); Management Analyst, GS-12 (B/P-00-2) (Donohoe Dep.

employees of the USIA and other agencies.  (*See* Donohoe Dep. Exs. 8, 11, 13, 15, 16, 21, 22, 30-32, 39, 41; Def.'s Ex. 1 ¶ 24.)  Because plaintiff could not be considered for these positions, the agency had no reason to notify her of the announcements.  *See* 5 C.F.R. § 330.208(a)(1) (RPL registrant "qualified" for a position when she "[m]eets OPM-established or approved qualification standards and requirements for the position, including any minimum educational requirements, and any selection placement factors established by the agency").[14]

Of the thirteen remaining vacancy announcements, eleven[15] relate to clerical positions ranging in grade from GS-2 to GS-7.  (*See* Donohoe Dep. Exs. 7, 12, 14, 17, 20, 23, 26, 27, 29, 33, 43.)  According to defendant, plaintiff was not referred for these positions due in part to language in her reemployment application indicating that, "if offered another job in the same series," she would accept "any good job to retain salary."  (Def.'s Mem. in Supp. at 11, 14; Pl.'s

---

Ex. 39); Administrative Officer, GS-11 (PA-00-69) (Donohoe Dep. Ex. 41).

[14] Plaintiff argues at some length that she was "adversely affected when she was not referred for positions that were 'status only,'" asserting that "she was considered to have status as a candidate on the RPL."  (Pl.'s Opp'n at 13-14, 17, 23.)  Plaintiff, however, consistently mischaracterizes the meaning of "status."  A requirement of "status," which limits positions to candidates having worked in the competitive service, is distinct from a requirement that an applicant be presently employed by a specific federal agency.  (*See* Def.'s Exs. 6/8 at 190-91, 276-77 (Donohoe deposition); Pl.'s Ex. 24 at 320 (Welch deposition) (stating that plaintiff "would not be considered a status employee, she would be considered having status as a candidate").)

[15] Personal Assistant (Typing), GS-5/6/7  (PA-99-177) (Donohoe Dep. Ex. 7); Office Assistant (Typing), GS-6/7 (B/P-99-136) (Donohoe Dep. Ex. 12); News Assistant (Typing), GS-4/5/6 (B/P-99-54) (Donohoe Dep. Ex. 14); Clerk Typist, GS-2/3/4 (B/P-99-67) (Donohoe Dep. Ex. 17); News Assistant (Typing), GS-4/5/6 (B/P-99-54A) (Donohoe Dep. Ex. 20); Clerk Typist (Typing), GS-2 (B/P-99-44) (Donohoe Dep. Ex. 23); Office Assistant (Typing), GS-7 (B/P-99-32) (Donohoe Dep. Ex. 26); Office Assistant (Typing), GS-5 (B/P-99-30) (Donohoe Dep. Ex. 27); Personnel Assistant (Typing), GS-4/5/6/7 (B/P-99-28) (Donohoe Dep. Ex. 29); Mail and File Clerk, GS-5 (B/P-99-11) (Donohoe Dep. Ex. 33); Personal Assistant (Typing), GS-7 (B/P-98-166) (Donohoe Dep. Ex. 43).

-28-

Ex. 4.)  While plaintiff contends that she was entitled to "pay retention" and could therefore have accepted any position without a loss of salary, she offers no authority in support of the contention -- one that appears dubious at best.  (*See* 5 C.F.R. § 351.701 (providing certain employees with assignment rights to positions "no more than three grades . . . below the position from which the employee was released"); *id*. § 531.221(a) (providing agencies with discretion to set a reemployed employee's basic pay rate at a level equal to that previously earned, within the bounds of the new position's grade).)  Regardless, plaintiff's reemployment application -- even when supplemented with her résumé in May 1999 -- failed to demonstrate her qualifications for these positions, since there is no reference to clerical experience.  (*See* Pl.'s Ex. 4; Def.'s Ex. 4 at J8-B.)  *See Greene*, 164 F.3d at 675 ("Absent supporting facts . . . a jury would be in no position to assess [plaintiff's] claim of superior[] qualifications.").

The two remaining positions identified by plaintiff are identical in all relevant respects: TV Broadcast Technician, GS-12 (PA-00-38), and TV Broadcast Technician, GS-9/11/12 (PA-00-87).  (*See* Donohoe Dep. Exs. 40 and 42.)  Applicants for both positions were required to satisfy a number of "mandatory" requirements: first, "knowledge of a wide range of complex television production systems, including audio mixers, analog and digital video switchers, character generators, videotape recorders, studio cameras, studio lighting, digital video effects systems, and associated technical systems[;]" second, "[c]omplete understanding of TV signal measurement[;]" third, "[e]xperience as a videotape operator/editor with both analog and digital systems[;]" fourth, "[s]kill in preventive and corrective maintenance down to the individual component level on a wide variety of professional broadcast equipment[;]" and, last, an ability to communicate through various mediums.  (*Id.*)  According to Human Resources Specialist Renee

White, Black was not referred for these positions because her résumé failed to "indicate 1 year of experience at the next lower grade level in the technical requirements of this position, such as studio lighting/operations, camera operation or as a video technician." (Def.'s Ex. 1 at 16.)  As discussed with regard to B/P-99-53,[16] White's explanation is consistent with plaintiff's résumé, which indicates only that she had supervised "studio operations" and was accordingly "familiar with [various] pieces of [studio] equipment and their capabilities," but does not reflect personal experience operating cameras, lighting and the like.  (*See* Def.'s Ex. J8-B.)  Summary judgment is therefore appropriate with regard to this claim.

## V.     Pretext

        In addition to challenging defendant's contention that she was unqualified for the above positions, plaintiff argues that defendant's unlawful motive is evident for other reasons: defendant's alleged reliance on a "falsehood" regarding the positions for which plaintiff wished to be referred; Black's suspicion that she was alone in not being rehired from the agency's list; an alleged widespread awareness of plaintiff's discrimination complaint in the agency's personnel office; and statements by other employees indicating that Office of Personnel Director John Welch thought of her as a "troublemaker." (Pl.'s Opp'n at 10, 12, 14-15, 17-18, 24-25.)  These arguments, however, do not suffice.  In characterizing this case as one in which the defendant went to "ridiculous" lengths in order to deny plaintiff the reemployment consideration she was owed (Pl.'s Opp'n at 20; *see also* Pl.'s Stmt. ¶¶ 42, 44), plaintiff mischaracterizes the record.  Though plaintiff repeatedly cites the January 20, 2000 letter of Brenson Long, Chief of the

---

        [16]Because Black was determined unqualified for the earlier-announced position of TV Broadcast Technician (B/P-99-53), for which she appears to have been referred by the agency, defendant had no reason to refer her for the latter two positions, since they required the same qualifications.

Personnel Operations Division, as an attempt by defendant to document the "falsehood" that

Black only wished to be considered for GS-13 positions (*see* Pl.'s Opp'n at 13, 18), the

correspondence cannot support such a nefarious reading.  While the document does reflect the

agency's understanding, based on her reemployment application, that plaintiff only wished to be

considered for "positions at the GS-13 level," the remark is an aside in a letter asking if Black

would nonetheless be interested in interviewing for a GS-9/11 opening.[17]  (*See* Pl.'s Ex. 37.)

Thus, rather than evidencing defendant's refusal to consider plaintiff for positions of a lower

grade than that at which she was previously employed, Long's letter is a request to do the

opposite.

Plaintiff's arguments regarding the limited number of referrals she received during her

years on the agency's priority list are also unpersuasive.  (*See* Pl.'s Mot. ¶ 7 ("For the two (2)

years that plaintiff was on the RPL, she was only referred for consideration by defendant for two

(2) vacancies . . . ."); Pl.'s Opp'n at 10 ("For 2 years plaintiff remained on the RPL and out of the

2 years, plaintiff was referred for 2 positions from the RPL and interviewed for 2 others she

applied for.  Despite no allegations of poor work performance, which would be inconsistent with

plaintiff's personnel file given her performance appraisals, plaintiff did not get a job while on the

RPL."); *id.* at 11 ("Plaintiff does not believe that she was referred for consideration as required

and there is no evidence that she was."); *id.* at 20 ("Despite being on the RPL for 2 years,

---

[17]Plaintiff's repeated suggestion that defendant manufactured a salary limitation is
without merit, since in her reemployment application Black unequivocally stated that she would
"accept . . . any good job to retain salary."   (*See* Pl.'s Ex. 20 at 198 (Black deposition); Pl.'s Ex. 4
(application).)  While plaintiff argues that her entitlement to pay retention undermined the
limitation apparent in this statement, it is disingenuous for her to contend that defendant should
not have considered the salary of announced vacancies.

Plaintiff was never placed in any position despite all that came open within this federal

government and she was the only Graphics employee RIF'd.").)  Notably, plaintiff has failed to

identify a single position that the agency failed to refer her to without justification.[18]

Finally, plaintiff's evidence that Director Welch regarded her as a "troublemaker" is

insufficient to support the inference of retaliation she advances.  Absent from the record is any

indication that Welch believed Black a "troublemaker" because of her protected activity (*see* Pl.'s

Ex. 20 at 32, 34 (Black's deposition) (indicating that personnel employers Tony Natale and Maria

Sulla told plaintiff that Welch regarded her as a "troublemaker," without explanation); *see also*

Def.'s Ex. 4 at I3 (Debra Schackner affidavit) (indicating that unnamed persons were "against

[plaintiff] being hired" and "didn't like her")).  Moreover, for the reasons discussed above, any

arguably improper motivation that Welch might have harbored is not reflected in the agency's

administration of its priority list, in which Welch had no direct involvement.  (*See* Pl.'s Ex. 24 at

82 (Welch deposition) (Welch's statement that he was not involved in administering the agency's

list at the time of Black's enrollment).)

## VI.     Denial of Training and Assistance

Plaintiff also challenges defendant's alleged denial of training and other assistance both

before and after her separation from the agency.  (*See* Pl.'s Opp'n at 8-9, 11, 18-19, 21-22.)

 She relies on various documents in support of the claim: language in a June 4, 1998 Certification

---

[18]/Plaintiff's related assertion that defendant violated RPL procedures by failing to provide
her with updated copies of the list or information regarding who was ultimately selected for
vacancies is without basis.  (*See* Pl.' s Opp'n at 8.)  Though there is record of the agency's March
7, 1997 agreement to provide the American Federation of Government Employees with RPL
information (Def.'s Ex. 4 at J2), plaintiff was not a member of the union and has failed to offer
any authority indicating that she was entitled to such information.  (*See* Def.'s Ex. 8 at 404
(Donohoe deposition).)

of Expected Separation referencing "programs intended to assist [her] to locate alternative

employment, or improve [her] alternate employment prospects, prior to the expected date of

reduction in force" and specifically noting the existence of Department of Labor funding "for

various types of retraining and readjustment assistance to displaced workers" (Pl.'s Ex. 44); a

November 9, 1998 internal message regarding "a two-week . . . training program designed to

provide ALL INTERESTED B/TV EMPLOYEES with the basics of operating a Chyron

computer," one aimed at "gain[ing] . . . a few new employees who can help out from time to time

with Chyron needs" (Pl.'s Ex. 11 (emphasis in original)); an uncited Career Transition Assistance

Program provision stating that "'the President's directive also requires agencies to develop

policies for retraining their employees who are affected by downsizing'" (Pl.'s Opp'n at 22-23); a

provision in the labor-management agreement negotiated by the American Federation of

Government Employees providing that "[t]he Agency will offer retraining to [RIF] affected

employees, within the limits of Agency resources, federal training regulations, the authority of

the Agency to waive qualification requirements, and will do so to the extent that the needs of the

service can be met and the employee is capable of acquiring new skills" (Pl.'s Ex. 25 at 69); and a

later union agreement regarding two digital video camera training sessions (Pl.'s Exs. 38 and 43).

     Plaintiff has failed to raise a genuine issue regarding her entitlement to training and

assistance.[19]  While "retraining and readjustment assistance" is mentioned in Black's Certificate

---

[19]It is also evident that plaintiff has failed to exhaust these claims.  In her September 20, 1999 letter notifying the agency of her desire to file a retaliation claim -- a letter that followed her separation from the agency by a year -- plaintiff made no mention of training opportunities, complaining instead that she had not been rehired despite her qualifications.  (Pl.'s Ex. 10.)  This focus is reflected in the retaliation claim ultimately accepted for investigation by the agency: "Whether [Black] ha[d] been retaliated against when, as she alleges, she was not selected and rehired by the Agency based on her placement on the Agency's reemployment priority placement list, her seniority with the Agency, or for any positions for which she applied between

of Expected Separation, the referenced funds were available not through the defendant agency but rather the Department of Labor. (Pl.'s Ex. 44.) The November 9, 1998 announcement regarding Chyron training was explicitly limited to the present employees of the agency, a limitation consistent with the program's narrow purpose of "gain[ing] . . . a few new employees who can help out from time to time with Chyron needs." (Pl.'s Ex. 11.) Plaintiff's reliance on agreements between the agency and the American Federation of Government Employees is misplaced since, as she has consistently maintained, she was not a member of the union. (*See Black*, Civ. No. 00-3036, at 4 n.2; Pl.'s Opp'n at 4-5; Pl.'s Stmt. ¶ 24.). Regardless, the union agreements relied upon either anticipate the establishment of retraining programs plaintiff has failed to identify here (*see* Pl.'s Ex. 25 at 69), or relate only to present employees. (*See* Pl.'s Ex. 43.) Plaintiff's arguments to contrary again misrepresent the language of the documents at issue. While agency labor liason James Hagan did notify union representatives that "the Bureau [would] make two offers of temporary employment to Rif-ed former Bureau employees" during union-negotiated digital video camera training sessions (*see* Pl.'s Ex. 17), plaintiff is incorrect in arguing that the training sessions were therefore open to former employees. Under the terms of the agreement Hagan's letter referenced, the Bureau stated only that it would employ former Bureau employees as "additional temporary employees to make up for shortages of personnel during the training/pilot project." (*See* Pl.'s Ex. 43 ¶ 4.) The training itself was clearly limited to agency employees. (*Id.* ¶ 2.) Thus, plaintiff cannot, as a matter of law, succeed on her claim regarding training and assistance.

---

September 22, 1998 and September 20, 1999." (Pl.'s Ex. 7.) Defendant, therefore, has not been given "the opportunity . . . to right any wrong that it might have done" with respect to training. *President v. Vance*, 627 F.2d 353, 362 (D.C. Cir. 1980); *see also Park v. Howard Univ.*, 71 F.3d 904, 907-08 (D.C. Cir. 1995).

-34-

**CONCLUSION**

For the reasons stated above, the Court will grant defendant's Motion for Summary

Judgment.

_____ s/ _____
ELLEN SEGAL HUVELLE
United States District Judge

Date:  March 31, 2006